# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE CALIFORNIA WINERY WORKERS' PENSION TRUST FUND,<br><br>Plaintiff,<br><br>v.<br><br>GIUMARRA VINEYARDS, et al,<br><br>Defendants. | Case No. 1:17-cv-00364-SAB<br><br>ORDER GRANTING PLAINTIFF'S MOTIONS IN LIMINE AND GRANTING DEFENDANTS' ORAL MOTION TO AMEND PRETRIAL ORDER<br><br>(ECF Nos. 45, 51) |

## I.

## BACKGROUND

Pursuant to a collective bargaining agreement, Defendant Giumarra Vineyards participated in the California Winery Workers' Pension Plan ("the Fund") for the benefit of its employees. Effective June 1, 2008, Giumarra Vineyards withdrew from the Fund by ceasing to make contributions to the Fund and there was a mass withdrawal of all employees at the end of 2008. On September 2008, a letter was sent to Mr. Giumarra setting forth Giumarra Vineyard's prorate share of the Fund and establishing an annual payment of $19,721 which was to be paid in quarterly payments of $4,930.25. On March 10, 2009, the Fund sent a letter to Mr. Giumarra setting forth a payment schedule with quarterly payments due on March 9, June 9, September 9, and December 9 of each year.

1

1 | Giumarra Vineyards missed the first quarterly payment of 2011.  On June 6, 2011, the Funds' attorney contacted Giumarra Vineyards' counsel to inform her that Giumarra Vineyards was in default due to nonpayment of the quarterly payment due on March 9, 2011.  The Fund mailed a letter dated March 14, 2011 to Giumarra Vineyards informing them they were in default due to the missed quarterly payment and demanding payment of $33,854.527.00 plus interest at 3.25 percent.  Giumarra Vineyards contends that the delinquency letter was never received.  On June 7, 2011, the Fund's attorney emailed a copy of a letter dated March 14, 2011 to Giumarra Vineyards' attorney.  On June 8, 2011, the Fund received Giumarra Vineyards' missed quarterly payment which also included the interest due.  Giumarra Vineyards has continued to make quarterly payments from June 2011 through December 2017 on time and the Fund has accepted these payments.[1]

On March 10, 2017, the Board of Trustees of the California Winery Workers' Pension Trust Fund ("Plaintiff") filed this action against Giumarra Vineyards.  (ECF No. 1.)  On May 9, 2017, Plaintiff filed a first amended complaint naming additional parties.  (ECF No. 6.)  On July 6, 2018, all the named defendants were dismissed at the stipulation of the parties with the exception of Giumarra Vineyards and Giumarra Investments, LLC ("Defendants").  (ECF Nos. 38, 39.)

Currently before the Court is Plaintiff's motions in limine filed on August 15, 2018.  (ECF No. 45.)  Defendants filed an opposition on August 29, 2018.  (ECF Nos. 51, 52.)

Oral argument on the motions in limine was held on September 5, 2018.  Counsel Michael Korda appeared for Plaintiff and counsel Mark Casciari appeared for Defendants.  Having considered the moving papers, the arguments presented at the September 5, 2018 hearing, as well as the Court's file, the Court issues the following order granting Plaintiff's motion in limine numbers 1, 2, and 3.

///

///

---

[1] The background is taken from the order denying Defendants' motion for summary judgment.  (ECF No. 37.)

## II.
## LEGAL STANDARD

"A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." United States v. Heller, 551 F.3d 1108, 1111 (9th Cir. 2009). A party may use a motion in limine to exclude inadmissible or prejudicial evidence before it is actually introduced at trial. See Luce v. United States, 469 U.S. 38, 40 n.2 (1984). "[A] motion in limine is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings." Jonasson v. Lutheran Child and Family Services, 115 F.3d 436,440 (7th Cir. 1997). A motion in limine allows the parties to resolve evidentiary disputes before trial and avoids potentially prejudicial evidence being presented in front of the jury, thereby relieving the trial judge from the formidable task of neutralizing the taint of prejudicial evidence. Brodit v. Cambra, 350 F.3d 985, 1004-05 (9th Cir. 2003). Some evidentiary issues are not accurately and efficiently evaluated by the trial judge in a motion in limine and it is necessary to defer ruling until during trial. Jonasson, 115 F.3d at 440.

## III.
## DISCUSSION

Plaintiff seeks ruling on three motions in limine: 1) exclude evidence of buyouts by other employers; 2) exclude evidence of purported delinquencies in withdrawal liability payments by other employers; and 3) exclude the expert report of Ian Altman. Plaintiff asserts that as a result of the mass withdrawal of all employees, Giumarra Vineyards was assessed with a withdrawal liability of $33,854,527.00. Since Defendants did not contest this amount in an arbitration proceeding, Plaintiff argues that the amount demanded by the plan sponsor is due and owing on the schedule set forth. Defendants counter that the evidence Plaintiff is attempting to preclude is relevant to the issue of the Fund's credibility.

Defendants also argue that generally ruling on a motion in limine is superfluous where the trial will be conducted by the Court. While some courts do find that such motions are unnecessary in a bench trial, it is far from universal that motions in limine should not be decided prior to a bench trial. Estate of Rick v. Stevens, No. C 00-4144-MWB, 2002 WL 1713301, at *2

(N.D. Iowa July 2, 2002). "In theory, the Federal Rules of Evidence apply equally in court trials and jury trials." Practice Under Original Rule 43—Evidence in Nonjury Cases, 9A Fed. Prac. & Proc. Civ. § 2411 (3d ed.). This Court finds that there are trial management benefits to a motion in limine that are equally beneficially to a bench or jury trial. For instance, a motion in limine provides the parties with a ruling regarding the admissibility of evidence and allows them to formulate their trial strategy. United States v. Luce, 713 F.2d 1236, 1239 (6th Cir. 1983), aff'd, 469 U.S. 38 (1984). A motion in limine is also "an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings." Jonasson, 115 F.3d at 440. "The purpose of an in limine motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996). These benefits of a motion in limine are applicable to both bench and jury trials.

Here, the parties dispute whether damages in this action are set by the statutory scheme or if the Court may properly reduce the damages proscribed by the statute. The Court finds that particularly where, as here, the parties have raised a legal issue in the motions in limine it is to the benefit of the parties and the Court to have the issue resolved before the trial of the matter.

Pursuant to the Employee Retirement Income Security Act ("ERISA"), "an employer who withdraws from an underfunded pension plan is required to pay 'withdrawal liability,' an amount equal to that employer's pro rata share of the plan's unfunded vested benefits, subject to certain adjustments.' Operating Engineers' Pension Tr. Fund v. Clark's Welding & Mach. ("Clark's Welding & Mach."), 688 F.Supp.2d 902, 906–07 (N.D. Cal. 2010) (quoting 29 U.S.C. §§ 1381, 1391). "An employer incurs withdrawal liability when it effects a 'complete withdrawal' from the plan, which occurs when the employer 'permanently ceases to have an obligation to contribute under the plan' or 'permanently ceases all covered operations under the plan.'" Clark's Welding & Mach., 688 F.Supp.2d at 907 (quoting 29 U.S.C. § 1383(a)).

> The Act does not call upon the employer to propose the amount of withdrawal liability. Rather, it places the calculation burden on the plan's trustees. The trustees must set an installment schedule and demand payment "[a]s soon as

practicable" after the employer's withdrawal. [29 U.S.C.] § 1399(b)(1). On receipt of the trustees' schedule and payment demand, the employer may invoke a dispute-resolution procedure that involves reconsideration by the trustees and, ultimately, arbitration. Id. §§ 1399(b)(2), 1401(a)(1). "Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." Id. § 1401(a)(1). "If no arbitration proceeding has been initiated . . . the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor. The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection." Id. § 1401(b)(1).

Clark's Welding & Mach., 688 F.Supp.2d at 907. ERISA requires that the resolution of disputes regarding the establishment, computation and collection of withdrawal liability be through arbitration. Shelter Framing Corp. v. Pension Benefit Guar. Corp., 705 F.2d 1502, 1509 (9th Cir.1983), rev'd on other grounds, 467 U.S. 717 (1984); Teamsters Pension Tr. Fund-Bd. of Trustees of W. Conference v. Allyn Transp. Co., 832 F.2d 502, 505-06 (9th Cir. 1987).

Pursuant to section 1401, any dispute as to the amount demanded "shall be resolved through arbitration" and Defendants were to initiate an arbitration proceeding within 60 days after being notified of the final determination concerning withdrawal liability (or 120 days after the employer requests review of the decision, whichever date is earlier). 29 U.S.C. 1401(a)(1). On March 14, 2011, a letter was mailed to Giumarra Vineyards informing them they were in default due to the missed quarterly payment and demanding payment of $33,854.527.00 plus interest at 3.25 percent.[2] While Plaintiffs dispute that they received this letter, it is undisputed that Defendants received the letter around June 7, 2011. Since no arbitration proceeding was initiated, the amounts demanded by the plan sponsor are due and owing on the schedule set forth. 29 U.S.C. 1401(b)(1). There is no triable issue of fact concerning Defendants' withdrawal liability. Clark's Welding & Mach., 688 F.Supp.2d at 914. By failing to arbitrate the amount withdrawal liability demanded by Plaintiff in the time period set forth in the statute, Defendants forfeited the right to dispute the amount of their withdrawal liability. Nat'l Shopmen Pension Fund v. DISA Indus., Inc., 653 F.3d 573, 582 (7th Cir. 2011); see also Pension Tr. Fund for Operating Engineers v. Dalecon, Inc. ("Dalecon, Inc."), No. C 11-02851 LB, 2014 WL 1007274,

---

[2] It would appear that Defendants were provided with the amount of their withdrawal liability at an earlier date, but the Court need not decide this as there is no evidence that Defendants sought arbitration of the amount of their withdrawal liability at any time.

at *7 (N.D. Cal. Mar. 12, 2014) ("An employer that fails to initiate arbitration in a timely manner waives defenses and objections that must have been raised in arbitration."). Further Defendants do not challenge that Plaintiff correctly determined their withdrawal liability. (See Pretrial Order p. 6, ECF No. 42.) Defendants' withdrawal liability in this action is $33,854,527.00.

The Federal Rules of Civil Procedure provide that generally relevant evidence is admissible at trial. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence can be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### A.  Motion to Exclude Evidence of Buyouts by Other Employers

Plaintiff contends that Defendants intend to offer evidence that other employers had withdrawn from the Fund by making a lump sum payment to the Fund pursuant to Settlement and Release Agreements. Plaintiff asserts that Defendants contend that should they be found liable in this case, relief should be satisfaction of Defendants' obligation to the Fund computed in the same manner used by the Fund to allow other participants to buy out their withdrawal liability. Plaintiffs argue that Defendants can point to no case law or statute that supports their argument that if they are found to have defaulted on their obligations under 29 U.S.C. § 1399(c)(5) that they are entitled to change the statutory damages which would be the total of their assessed withdrawal liability and interest thereon. Plaintiffs seek exclusion of this evidence on the ground that it is not relevant in this action.

Defendants counter that this evidence is relevant because it calls into question the Funds motivation to pursue and properly execute through its mailing a delinquency notice to Giumarra Vineyards. Defendants also contend that this is relevant to determining the proper measure of damages. Defendants argue that the Court can reduce the statutory award if it would be excessive and that the presentation of such evidence will not be time consuming.

First, the Court is not persuaded that this evidence has any bearing on credibility or the

motivation of Plaintiff to pursue the delinquency notice.  Defendants argued at the September 5, 2018 hearing that evidence will show that other employers received a delinquency notice and made a quarterly payment which did not include interest and no suit for default was filed.  However, Defendants concede that this evidence shows that the notices were mailed to the other employers.  Evidence regarding the Fund's failure to file default against or settlement with other employers does not tend to make any fact in this action more or less probable than it would be without the evidence.  Here, Defendants have not sought to introduce evidence to show that Plaintiff incorrectly calculated their withdrawal liability, but seek to admit this evidence for the purpose of showing that the damages sought in this matter are excessive.

Defendants rely on St. Louis, Iron Mt. & S. Ry. Co. v. Williams, 251 U.S. 63, 66–67 (1919) and United States v. Citrin, 972 F.2d 1044, 1051 (9th Cir. 1992), which held that "[a] statutorily prescribed penalty violates due process rights 'only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.' " In St. Louis, Iron Mt. & S. Ry. Co, the court dealt with a statute that imposed a penalty of $50 to $300 for each instance in which the carrier collected compensation greater than allowed by the statute.  251 U.S. at 63-64.  In Citrin, the court was addressing the statutory scheme which award three times the scholarship funds awarded as damages.  972 F.2d at 1051-52.  Defendants also rely on cases that address statutory damages under the Telephone Consumer Protection Act, Golan v. Veritas Entm't, LLC, No. 4:14CV00069 ERW, 2017 WL 3923162 (E.D. Mo. Sept. 7, 2017); Centerline Equip. Corp. v. Banner Pers. Serv., Inc., 545 F.Supp.2d 768, 773 (N.D. Ill. 2008); and the Fair Credit Reporting Act, Murray v. GMAC Mortg. Corp., 434 F.3d 948, 952 (7th Cir. 2006).  All of the cases cited by Defendants address statutes which impose penalties for violation of laws.  Defendants have presented no authority that the withdrawal liability is properly characterized as a statutorily imposed penalty.

In this instance, Defendants are not being subjected to a penalty for their failure to submit the quarterly payments, but Plaintiff is seeking to collect the amount of liability that Defendants incurred by withdrawing from the fund.

[W]hen employers withdraw from a multiemployer pension plan regulated by

> ERISA, they must pay their proportionate share of the [unfunded vested benefit] as "withdrawal liability" so that the plan is compensated for benefits which have already vested with the employees at the time of the employer's withdrawal. [Citation.] Otherwise the financial burden of the employees' vested benefits would shift to other employers in the plan and ultimately to the Benefit Guarantee Corporation [. . . ], which insures such benefits.

Irigaray Dairy v. Dairy Employees Union Local No. 17 Christian Labor Ass'n of U.S. Pension Tr., 43 F.Supp.3d 1080, 1085 (E.D. Cal. 2014) (quoting United Foods, Inc. v. Western Conference of Teamsters Pension Trust Fund, 816 F.Supp. 602, 606 (N.D. Cal. 1993) (aff'd 41 F.3d 1338)).

ERISA was enacted because "Congress wanted to guarantee that 'if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it.' " Pension Benefit Guaranty Corporation v. R.A. Gray and Co. ("R.A. Gray and Co."), 467 U.S. 717, 720 (1984). To achieve this purpose, ERISA creates a plan termination insurance program which is administered by the Pension Benefit Guaranty Corporation ("PBGC"), a wholly owned Government corporation within the Department of Labor. R.A. Gray and Co., 467 U.S. at 720. "The PBGC collects insurance premiums from covered pension plans and provides benefits to participants in those plans if their plan terminates with insufficient assets to support its guaranteed benefits." Id. "One of the primary problems Congress identified under ERISA was that the statute encouraged employer withdrawals from multiemployer plans." Id. at 731.

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. §§ 1381-1461, was enacted by Congress to protect the financial solvency of multiemployer pension plans. Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of California, 522 U.S. 192, 196 (1997). "The MPPAA was enacted in 1980 based on Congressional and agency findings that 'ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans.' " Clark's Welding & Mach., 688 F.Supp.2d at 907 (quoting R.A. Gray and Co., 467 U.S. at 722). "The amendments were designed to reduce the incentive for employers to withdraw from multiemployer plans and to lessen the impact and burdens on plans

when employers do withdraw." Clark's Welding & Mach., 688 F.Supp.2d at 907.

During Congressional hearings, the executive director of the PBGC explained that a key problem in these multiemployer plans is the employer withdrawal with reduces the plan's contribution base. R.A. Gray & Co., 467 U.S. at 722 n.2.

> To deal with this problem, our report considers an approach under which an employer withdrawing from a multiemployer plan would be required to complete funding its fair share of the plan's unfunded liabilities. In other words, the plan would have a claim against the employer for the inherited liabilities which would otherwise fall upon the remaining employers as a result of the withdrawal. . . .
>
> We think that such withdrawal liability would, first of all, discourage voluntary withdrawals and curtail the current incentives to flee the plan. Where such withdrawals nonetheless occur, we think that withdrawal liability would cushion the financial impact on the plan.

Id. (quoting Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2nd Sess., 22 (1978) (statement of Matthew M. Lind)).

"[T]he Act sets the total amount of 'withdrawal liability' at a level that roughly matches 'the employer's proportionate share of the plan's 'unfunded vested benefits.' " Bay Area Laundry & Dry Cleaning Pension Tr. Fund, 522 U.S. at 196 (quoting Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414, 416-417 (1995)). "The 'unfunded vested benefit liability' measures the shortfall in the fund's assets." Bd. of Trustees of W. Conference of Teamsters Pension Tr. Fund v. Thompson Bldg. Materials, Inc. ("Thompson Bldg. Materials, Inc."), 749 F.2d 1396, 1399 (9th Cir. 1984). "The fund's 'vested benefit liability' is the actuarial present cash value of all of the benefits that have vested. If the pension fund has insufficient assets to cover its vested benefit liability, the difference between the assets and the liability is the 'unfunded vested benefit liability.' " Thompson Bldg. Materials, Inc., 749 F.2d at 1399. "[I]f an employer withdraws from a multiemployer plan, it incurs 'withdrawal liability' in the form of 'a fixed and certain debt to the pension plan.' " Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California, 508 U.S. 602, 609 (1993) (quoting R.A. Gray & Co., 467 U.S. at 725).

Should the employer fail to make quarterly payments according to the schedule set forth

by the plan, the plan has the option to invoke the statutory acceleration provision. Bay Area Laundry & Dry Cleaning Pension Tr. Fund, 522 U.S. at 196. "While the assessment of withdrawal liability that results from a failure to arbitrate produces a harsh result, the result is largely 'a self-inflicted wound.' "[3] Clark's Welding & Mach., 688 F.Supp.2d at 914 (citation omitted).

The statute does not impose a penalty, but sets forth the manner in which an employer's withdrawal liability is to be calculated. See 29 U.S.C. § 1391. Section 1391 requires that the employer pay its proportional share of the plan benefits. Id. Therefore, the Court finds the cases cited by Defendants to be distinguishable. Since the Court finds that the liability imposed is not a penalty, Defendants argument that the liability imposed violates the United States Constitution is without foundation. As the $33,854.527.00 is the amount in damages that Defendants owes to the Fund as their proportional share of the plan benefits, evidence to show that the amount is an excessive penalty is irrelevant to the issues to be decided in this action, including the constitutional assertion because the excessive penalty provision is not implicated.

Section 1401 provides that the plan sponsor may bring an action for collection of an employer's withdrawal liability. 29 U.S.C. § 1401(b)(1). Here, Plaintiff has brought suit seeking to collect Defendants' withdrawal liability alleging that they are in default. The issue to be decided here is whether Defendants are in default. Should this issue be resolved in Plaintiff's favor, the amount of Defendants' withdrawal liability has been determined and is not in issue in this action. Evidence of the amounts that other employers paid due to settlement agreements is

---

[3] The Ninth Circuit has found that the statutory withdrawal liability is not "an irrational solution to the funding crisis faced by the multiemployer pension plans." Thompson Bldg. Materials, Inc., 749 F.2d at 1402.

> A fund's actuarial soundness at any specific time depends on a complex interaction of many factors including anticipated life spans of beneficiaries, estimated appreciation or depreciation of fund assets, and the likelihood that the contribution base will remain stable. The conservatism with which estimates of these factors are made may affect the outcome, and the numbers that are attached to these concepts are at best "still picture[s] of a moving target." Even though the process is dynamic, Congress' decision that the calculations be made upon the employer's withdrawal is reasonable. By forcing the economic burden upon the employer at the time of withdrawal, the Act insures that the employer will give appropriate consideration to the fund's soundness as part of the withdrawal decision.

Id.

not relevant to the issues to be decided during the trial of this matter. Accordingly, Plaintiff's motion in limine no. 1 to exclude evidence of buyouts by other employers is granted.

**B. Motion to Exclude Evidence of Purported Delinquencies in Withdrawal Liability Payments by Other Employers**

Similarly, Plaintiff argues that Defendants will try to introduce evidence that other employers in the Fund were delinquent in their withdrawal liabilities which have not resulted in default suits by the Fund and this has no relevance in this action. Defendants again counter that this evidence bears on the Fund's credibility as to whether it mailed the notice in the first instance and evidences that the Fund did not have reliable or well-established procedures for securing the receipt of delinquency notices. Defendants again contend that this evidence goes to the excessiveness of damages in this instance.

Contrary to Defendants' argument, whether Plaintiff pursued actions against other employers by itself will not assist the Court in determining whether a delinquency notice was mailed in this instance or the procedures that the Fund had in placed for securing the receipt of such notices. Evidence of mailing and the procedures in place will need to be presented by witnesses with personal knowledge of the facts and whether another employer was in default and the Fund decided not to pursue an action has no bearing on the mailing issues that will be presented in this action.

Further, Defendants argue that presentation of this evidence will not create an undue consumption of time but will only require the presentation of 10 joint exhibits. However, if Defendants are to present such evidence, Plaintiff would be entitled to present evidence to distinguish each instance from this action which would result in a separate trial on the merits of each of the other instances in which the Fund declined to prosecute a delinquency. The Court finds that allowing this evidence would create an undue consumption of time.

For the reasons discussed above, the Court finds that whether the Plan prosecuted actions against other employers is not relevant to Defendants' withdrawal liability. Withdrawal liability is governed by 29 U.S.C. § 1391(b), and is the "employer's proportional share of the unamortized amount of the change in the plan's unfunded vested benefits[.]" Therefore, whether

other employers were prosecuted for being delinquent has no bearing on Defendants' proportional share of the benefits or in determining credibility.

Evidence that other employers were delinquent and suits for default were not brought against them would not have "any tendency to make a fact more or less probable than it would be without the evidence" nor is it "of consequence in determining the action." Fed. R. Evid. 401. Therefore, such evidence is not relevant and Plaintiff's motion in limine no. 2 to exclude evidence that other employers were in default is granted.

### C. Motion to Exclude Expert Report of Ian Altman

Plaintiff seeks to exclude a report by Defendants' expert, Ian Altman. Plaintiff first argues that Mr. Altman's report addresses the "present value of withdrawal liability quarterly payments" and that the purpose of the testimony is to provide another method to argue an alternative calculation of damages. (ECF No. 45 at 5.) However, Plaintiff contends that statutory and case law is clear that if Defendants are found to have defaulted "the only proceeding left for this court is the determination of that total amount of the withdrawal liability, minus amounts that [Defendant] has already paid, plus interest, liquidated damages, and reasonable attorneys fees and costs which are **mandatory upon a judgment in favor of a plan...**" (Id. (emphasis in original). Secondly, Plaintiff argues that the remainder of Mr. Altman's report is merely a critique of how the Fund's actuary characterized the withdrawal liability in reports prepared for the Board of Trustees. Plaintiff contends that the amount of withdrawal liability is conceded and Mr. Altman's report is not relevant to any issue to be decided in this action.

Defendants counter that Mr. Altman will present testimony on the present value of their quarterly withdrawal liability payments, and the significance of the Fund's actuary's decision not to value the default obligation as a plan asset. Defendants contend that this evidence is admissible for the Court to determine damages.

ERISA requires "that the calculation of withdrawal liability be based on reasonable actuarial assumptions and the plan actuary's best estimate." Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc., 698 F.3d 346, 356 (7th

Cir. 2012).

Mr. Altman set forth his opinion regarding the present value of the withdrawal liability quarterly payments. (Expert Report of Ian H. Altman, FSA, ¶¶ 5-7, ECF No. 45-1.) Quarterly payments are "the product of--(I) the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and (II) the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs." 29 U.S.C. § 1399(c)(1)(C).

The methods for calculating withdrawal liability are set forth in 29 U.S.C. § 1391(b), which provides "[a]n employer's proportional share of the unamortized amount of the change in the plan's unfunded vested benefits for plan years ending after September 25, 1980, is the sum of the employer's proportional shares of the unamortized amount of the change in unfunded vested benefits for each plan year in which the employer has an obligation to contribute under the plan ending--(i) after such date, and (ii) before the plan year in which the withdrawal of the employer occurs." 29 U.S.C. § 1391(b)(2)(A). Mr. Altman's report does not challenge the Fund's calculation under the statutorily defined methods of calculating withdrawal liability. (See California Winery Workers Pension Plan Reallocation Liability as of December 31, 2008, ECF No. 30-3 at 107.) Further, at the September 5, 2018 hearing, Defendants asserted that they are not challenging the correctness of the Plan's calculated withdrawal liability.

An employer's withdrawal liability is based on the plan's unvested benefits while quarterly payments are based on the employer's contributions to the plan. Therefore, Mr. Altman's opinion regarding the current value of the quarterly payments is not relevant to Defendants' withdrawal liability.

Mr. Altman also sets forth his findings and opinions regarding the Fund actuary's actuarial evaluation reports for the years 2012-2016. (Id. ¶¶ 8-14.) However, Mr. Altman's opinion regarding the actuarial reports does not have any relevance to the issue to be decided in

1 the trial of this matter, which is whether Defendants are in default and amount of damages that
2 should be awarded should Plaintiff prevail. Damages in this matter would be Defendants'
3 withdrawal liability of $33,854,527.00 minus the amounts that Defendants have already paid,
4 along with interest, liquidated damages, and attorney fees and costs as mandated by statute.
5 Dalecon, Inc., 2014 WL 1007274, at *16.

Accordingly, Plaintiff's motion in limine no.3 to exclude the expert report of Mr. Altman is GRANTED.

### D. Motion to Amend Pretrial Order

Defendants made an oral motion at the September 5, 2018 hearing to amend section VII of the pretrial orders. The period for filing objections to the pretrial order expired July 27, 2018. (ECF No. 42 at 15.) Defendants filed an objection within the time period and the pretrial order was amended on July 30, 2018. (ECF Nos. 43, 44.) Defendants now seek to amend the pretrial order again to correct the exhibit numbers that are referenced in the stipulation of the parties. Defendants request shall be granted, but the Court notes that this is the second time that the pretrial order has been amended to correct an error in the joint pretrial statement.

## IV.

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiff's motions in limine nos. 1, 2, and 3 are HEREBY GRANTED; and

///
///
///
///
///
///
///
///
///

14

2. Defendants' motion to amend the pretrial order is GRANTED; and the pretrial order (ECF No. 42) is amended at 6:5-8 as follows:

Defendants do not contest that the "total mass withdrawal liability assessed to Giumarra Vineyards," calculated as of January 28, 2010 (reflected in Exhibit J-14), is $33,854,527.

Defendants do not contest that a copy of the March 14, 2011 letter (Exhibit J-47) was received by the office of Raphael Shannon on or about March 16, 2011.

IT IS SO ORDERED.

Dated: **September 6, 2018**

UNITED STATES MAGISTRATE JUDGE